UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ELIZABETH BRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO. 1: 03-cv-1709-DFH-TAB |
| | ) | |
| COLGATE-PALMOLIVE COMPANY | ) | |
| and HILL'S PET NUTRITION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Elizabeth Bender worked as an employee at defendant Hill's Pet Nutrition Indiana ("Hill's"), a manufacturer of pet food.[1]  Bender was subjected to various incidents that she alleges created a sexually discriminatory work environment that Hill's failed to remedy, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Bender also alleges that Hill's retaliated against her with discipline and ultimately with termination for complaining of harassment and discrimination.  Bender also alleges that Hill's interfered with the exercise of her statutory right to medical leave pursuant to the

---

[1]After filing this lawsuit as Elizabeth Bright, the plaintiff married and changed her name to Elizabeth Bender.  Bender Aff. ¶ 2.

Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and retaliated against her for exercising her FMLA rights.

Defendants Hill's and parent company Colgate-Palmolive have moved for summary judgment. As explained below, the court grants the motion with respect to Colgate-Palmolive because it was not Bender's employer. The defense motion is granted in part and denied in part with respect to Hill's. On her discriminatory work environment claim, Bender has identified a genuine issue as to whether verbal abuse toward females and gender-based separation of tasks and disparities in training were severe or pervasive in her workplace, whether Hill's had notice of these problems, and if so, whether Hill's took reasonable steps to remedy the situation. Bender also has identified a genuine issue as to whether Hill's retaliated against her for complaining about harassment or discrimination and for exercising her FMLA rights. Bender has failed to come forward with evidence that she was improperly denied FMLA leave.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Only genuine disputes over material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

On a motion for summary judgment, the moving parties must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the parties believe demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the moving parties have met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Local Rule 56.1 requires the party opposing a motion for summary judgment to identify specific and material factual disputes.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. at 255; *Celotex*, 477 U.S. at 323; *Baron v. City of Highland Park*, 195 F.3d 333, 337-

38 (7th Cir. 1999).  However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion.  The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record.  *Anderson v. Liberty Lobby*, 477 U.S. at 252; *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 637 (7th Cir. 2001); *Sybron Transition Corp. v. Security Insurance Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997).

*Undisputed Facts*

The following facts are either undisputed or reflect the evidence in the light most favorable to plaintiff Bender as the party opposing summary judgment. Adverse facts established by defendants beyond reasonable dispute are necessarily included in the narrative.

Plaintiff Elizabeth Bender began her employment at Hill's on February 28, 2000 as a production Technician in Y team of the Processing area.  Bender Dep. II at 52; Bender Aff. ¶¶ 27, 40.  The production areas at the Hill's Pet Nutrition plant in Richmond, Indiana include Dry Mix/Bulk, Processing, Packaging, and Stretchwrap.  Zaleha Aff. ¶ 5.  When Bender started working at Hill's, Technicians worked 8-hour shifts.  Bender Aff. ¶ 7.  As of early 2001, Technicians worked 12-hour shifts, and four teams of Technicians – W, X, Y, and Z teams – in production areas worked according to a rotation schedule that provided for two weeks of day shifts followed by two weeks of night shifts.  Zaleha Aff. ¶ 6; Bender Aff. ¶ 7; Pl.

Ex. 7.  In March 2001, Bender was transferred to the Y team of the Stretchwrap production area.  Bender Aff. ¶ 111.  In April or May 2001, Bender volunteered to move to W team in the Stretchwrap area.  Bender Aff. ¶ 112; Bender Dep. II at 150-51.

Technicians at Hill's were to some extent self-managing.  Bender Aff. ¶¶ 15, 383-88; Monroe Dep. at 54-59; Zaleha Aff. Ex. 2.  Technicians were sometimes required to work mandatory overtime on other teams, and failure to find a substitute to cover a missed overtime assignment was considered a performance issue.  Zaleha Aff. ¶ 16.  Technician compensation and benefits did not vary based on work area or work assignment.  Zaleha Aff. ¶ 10.  The hourly rates of Technicians began and increased at the same rate, subject to satisfactory attendance and performance, until the pay rates reached "parity" after two years of service.  Zaleha Aff. ¶ 11.

Some Technicians were designated as "mentors," who were responsible for training and guiding employees new to a production area.  Monroe Dep. at 50-52. Each Technician team had a team leader (the term "team leader" was changed to "area leader" in early 2001).  Bender Aff. ¶¶ 14, 16.  Team and area leaders reported to Operations Manager Darren Haverkamp, who in turn reported to Plant Manager Cathy Zaleha.  Haverkamp Dep. at 6-7; Zaleha Aff. ¶ 4.

Several incidents occurred during 2000-2001 that concerned Bender.  First, while Bender worked in the Processing area in Y team, she was subjected to the unwanted attentions of two co-workers.  Starting around March 2000, male Technicians asked Bender for dates, and at least one co-worker phoned Bender at home and showed up at her home unannounced.  Bender Aff. ¶ 33; Pl. Ex. 3. In June 2000, another male Technician followed Bender around the plant.  Bender Aff. ¶ 36; Pl. Ex. 3.  Bender complained about these incidents to team leader Christine Streets and Human Resources ("HR") employee Shelly Culbertson.  HR Manager Jackie Vanderpool was informed of the complaints.  Bender Aff. ¶¶ 34, 39; Pl. Exs. 3, 6.

Second, in April 2000, Bender's male mentor told her to clean the inside of a machine.  After she did so, he told her that a running auger had been within six inches of her arm.  Bender Aff. ¶¶ 49-52.  Bender complained about the auger incident to Dale Dangerfield of HR and to team leaders Terry Abner and Scott Gryzbowski.  Bender Aff. ¶¶ 58-62; Pl. Ex. 2.  Third, around August 2000, Bender complained to her mentor and to team leader Christine Sheets that she was not being trained.  Bender Aff. ¶ 96.  Fourth, around September 18, 2000, Bender's dog was shot.  Bender Aff. ¶ 99.  Afterward, Bender's co-workers made taunting sounds and comments about the shooting.  Bender Aff. ¶¶ 100-01, 103, 169-70. Fifth, several male employees directed derogatory language toward Bender and other female employees.  Bender Aff. ¶¶ 43, 45-46, 55, 62, 85-86, 93.  Bender complained to team leader Doug Dils in March 2001.  Bender Aff. ¶¶ 109-10.

Bender took paid short term disability leave from October 1 to October 25, 2000. Bender Aff. ¶¶ 106-07; Vanderpool Aff. ¶¶ 44-45.

Sometime in 2001-2002, during Bender's time in Processing and Stretchwrap, her co-workers repeatedly viewed sexual images on computers at work. Bender Aff. ¶¶ 89-91, 109, 165; Bender Dep. II at 220-30. Bender had to access these computers as part of her job. Bender saw a cartoon of a frog in a sexual position, nudity in a soup commercial, a screen saver of a nude woman on a beach, and a cartoon depicting nude terrorists. Bender Dep. II at 220-28. Bender also observed male employees watching "nude pictures of women, videos of women having sex with animals, videos of extremely large nude women, videos of women masturbating." Bender Aff. ¶¶ 89-91. Bender complained about these incidents to team leader Doug Dils in March 2001. Bender Aff. ¶¶ 109-10.

In the early morning hours of May 30, 2001, Bender received a phone call from her mother requesting that she go to the hospital where Bender's father had been taken for a heart attack or a stroke. Bender went to the hospital. She was scheduled to start work at 6:00 a.m. Bender Aff. ¶¶ 117-18. Bender phoned Hill's at about 10:15 a.m. and told a technician where she had been and that she would be out for the day. Bender Aff. ¶¶ 122-24. Bender did not receive FMLA leave for May 30th. Bender Aff. ¶ 125.

On June 1, 2001, team leader Lisa Edington placed Bender in the first stage of a Performance Improvement Process ("PIP"), the plant's disciplinary process at that time, for not calling in within the first four hours of her scheduled shift on May 30th.  Pl. Ex. 9; Bender Dep. II at 176-77, Ex. 3; Vanderpool Aff. ¶ 16.  The stages of a PIP were, in ascending order of severity, behavioral agreement, first stage, second stage, and termination.  Vanderpool Aff. ¶ 20.  The PIP was scheduled to end on May 30, 2002.  Pl. Ex. 9.  Bender requested and received paid FMLA leave from July 15 through August 30, 2001.  Bender Dep. II Ex. 6; Vanderpool Aff. 47.

In 2002, the PIP was replaced by the Individual Improvement Process ("IIP").  Vanderpool Dep. at 95-96, 98; Vanderpool Aff. Ex. 1.  The IIP stages were, in ascending order of severity, formal coaching, performance agreement, decision making leave, and "de-selection" (*i.e.*, termination).  Zaleha Aff. ¶ 17.  On February 1, 2002, Bender's first stage PIP was reclassified as an IIP performance agreement.  Bender Dep. II Ex. 12; Vanderpool Dep. at 95-96, Ex. 8.

In the spring of 2002, Hill's investigated a report of sexual images on workplace computers.  As a result of the investigation, eleven employees were suspended for two weeks without pay.  One of the employees suspended was Bender's area leader Everett Jenkins.  Bender Aff. ¶ 175.  Subsequently, management issued a statement to employees reminding them not to use workplace e-mail and computers for inappropriate purposes.  Zaleha Aff. ¶¶ 25-

30.  An employee subsequently spread a rumor that Bender had reported the problem to Colgate.  Bender Aff. ¶¶ 176-81.

In March 2002, Bender called the Colgate hotline to complain about the unfairness of her PIP/IIP and various incidents that took place in the Processing area.  Bender Dep. II at 304-06.  Bender subsequently sent hotline representative Elisa Tighe a letter documenting her complaints, which Tighe received on March 26, 2002.  Bender Dep. II at 304, Ex. 14.

In April 2002, mentor Mark Toney kissed Bender and touched her breast while the two were taking a smoking break he had suggested.  This contact was not welcome on Bender's part; she rejected the advance and told him not to do it again.  Bender Dep. I at 125-26; Bender Aff. ¶¶ 200-06.

Bender requested and received paid leave from April 16 through April 23, 2002.  Bender Dep. II Ex. 7; Vanderpool Aff. ¶¶ 48-49.  On April 23 or 24, 2002, Bender met with and complained to Zaleha about various workplace issues.  Bender Dep. II at 234-242; Zaleha Dep. at 57-61, 173, Ex. 19.  After the meeting, Zaleha sent Bender home.  Bender Dep. II at 248; Zaleha Dep. at 133.  Bender took leave from April 24 through May 31, 2002, part of which was designated as FMLA leave.  Bender Dep. II at 253; Vanderpool Aff. ¶¶ 50-51.  The end of Bender's disciplinary process was extended from the scheduled ending date of May 30, 2002 to July 26, 2002.  Vanderpool Dep. at 99, 114, Ex. 9; Bender Dep.

II at 211; Pl. Exs. 53, 64.  As a result of the PIP/IIP, Bender's parity raise was delayed six months and she lost 50 percent of her quarterly bonus.  Bender Aff. ¶ 137; Vanderpool Aff. ¶ 23.

Around June 7, 2002, Bender's mother found outside the door to Bender's home an open knife that was similar to those issued to male employees at Hill's. Bender did not own such a knife herself.  Bender Aff. ¶¶ 236-42.

On August 29, 2002, Bender had car trouble and tried to notify Hill's before the scheduled start of her shift.  She was able to reach an employee at Hill's by phone shortly after the start of the shift.   Bender Aff. ¶¶ 268-70.   Bender requested and received FMLA leave from September 3 through September 27, 2002.  Bender Dep. II at 261-66, Exs. 10-11; Bender Aff. ¶ 265; Vanderpool Aff. ¶ 52.  On September 6, 2002, Vanderpool wrote a memorandum recommending that Bender be placed in the decision making leave stage of an IIP.  Pl. Ex. 66; Zaleha Dep. Ex. 24.  Bender took leave from October 9 to October 25, 2002. Vanderpool Aff. ¶ 53.   On October 9, 2002, area leader Everett Jenkins and Operations Manager Darren Haverkamp placed Bender in a second IIP performance agreement (Bender apparently was never placed in the decision making leave stage recommended by Vanderpool) based on a determination that Bender had 48 hours of non-FMLA absences in a 12-month period and for failing to report the August 29, 2002 absence from work prior to the start of her shift. Bender Dep. II at 268-69, Ex. 13.

In August or September 2002, Bender filled out an on-line questionnaire expressing interest in employment with a federal government agency.  She was told that she qualified for testing for the position.  Bender Dep. I at 46.  The agency scheduled her for testing on November 9 and 10, 2002.  Bender Dep. I at 46-47.  On November 7, 2002, Bender learned that she had been scheduled to work mandatory overtime on November 9th.  Bender Aff. ¶ 308.  Bender complained that the assignment was not proper and that she was scheduled to be out of town November 9th.  Bender Dep. I at 48-50; Bender Aff. ¶¶ 309-312, 314, 317; Pl. Ex. 79.  Area leader Jenkins told Bender that she had to work overtime or she would face severe punishment, including termination.  Bender Dep. I at 49-50; Bender Aff. ¶¶ 313; Pl. Ex. 79; Jenkins Dep. at 16-17.  Bender asked co-worker Carol Isaacs to substitute for her on November 9th.  Isaacs agreed, but Hill's management did not allow the substitution.  Bender Aff. ¶¶ 315-16, 319; Bender Dep. II at 318; Jenkins Dep. at 18-20.

On November 10, 2002, Bender accepted a job offer from the federal agency to which she had applied.  Bender Aff. ¶ 329; Bender Dep. II Ex. 15.  On November 11th, Haverkamp and Vanderpool phoned Bender.  Bender Aff. ¶ 330.  Bender described the ensuing discussion as follows: "[F]irst [Haverkamp] started out saying something, 'I understand you didn't show up for your shift today,' and I said, 'Yes, I understand that I am terminated,' and I paused for a moment and he didn't say anything.  I said, 'Well, therefore I had accepted another position with [the federal agency].'"  Bender Dep. II at 321.  On January 23, 2003, Bender

filed an EEOC charge against Colgate-Palmolive.  Zaleha Aff. Ex. 4.  Other facts are noted below while keeping in mind the standard that applies on a motion for summary judgment.

*Discussion*

I.     *Colgate-Palmolive*

Colgate-Palmolive is not a proper defendant in this case because it was not Bender's employer.  There are three ways in which Colgate could be found to be a proper Title VII defendant:  (1) if Bender could present evidence that Colgate maintained an employment relationship with Bender; (2) if Bender could pierce the corporate veil and present evidence that Hill's is only an alter ego of Colgate; or (3) if Bender could present evidence that Colgate took actions to avoid liability under the discrimination laws or might have directed the discriminatory act, practice, or policy of which Bender complains.  *Worth v. Tyer*, 276 F.3d 249, 259-60 (7th Cir. 2001).   Bender's argument focuses on her alleged employment relationship with Colgate.  See Pl. Br. 49 at 18-19, 33.

In *Worth v. Tyer*, the Seventh Circuit looked to the five factors of the "economic realities test" to determine whether an alleged victim of sexual harassment was an employee of the defendant and thus had a right to sue under Title VII:  (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the type of job

and skills required to carry out the work and whether the skills are learned in the workplace; (3) the responsibility for cost of the operation (*i.e.*, who pays for equipment, supplies, fees, licenses, workplace, and maintenance of operations); (4) the method and form of payment and benefits; and (5) the length of the job commitment and/or expectations.  276 F.3d at 263, citing *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991).  Of these five factors, the most important is the right to control and direct the worker's actions. *Id.*; accord, *Alexander v. Rush North Shore Medical Center*, 101 F.3d 487, 492-93 (7th Cir.1996).

Bender's only reference to objective evidence of control is her claim that Colgate's corporate office was involved in her discipline and termination.  Pl. Br. 49 at 19; Pl. Br. 58 at 10.  The record evidence indicates that Colgate knew about at least some of Bender's complaints, advised Hill's management on how to interact with Bender, and may have approved requests by Hill's management to discipline employees.  See, *e.g.*, Pl. Exs. 33-35, 38, 41-44, 61-63, 66, 74, 84.  However, there is no evidence that Hill's management did not make the ultimate decisions about whether and how to discipline or terminate an employee.  See Pl. Ex. 74 (October 7, 2002 e-mail from Vanderpool at Hill's to Stahlman at Colgate); Vanderpool Aff. ¶¶ 60-62; Zaleha Aff. ¶¶ 42-43.  None of Bender's citations to the record raise an issue of material fact as to whether Colgate controlled her work, her discipline, or her separation.  Bender has not provided factual evidence tending to show that she was an employee of Colgate.  Bender also has not

-13-

provided any evidence to pierce the corporate veil or to implicate Colgate in the alleged discriminatory actions.  Colgate-Palmolive's motion for summary judgment is granted and Colgate-Palmolive is dismissed as a defendant.

II.     *Title VII – Discriminatory Working Conditions*

Bender claims that Hill's discriminated against her on the basis of sex in the terms and conditions of her employment in a variety of ways.  Title VII makes it unlawful to:  "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, *terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  One way in which an employer can discriminate with respect to terms and conditions of employment is by subjecting her to a hostile work environment based on her sex.   Title VII prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment."  *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004), quoting *Shanoff v. Illinois Dep't of Human Services*, 258 F.3d 696, 701 (7th Cir. 2001), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

To survive summary judgment on this claim, Bender must come forward with evidence that would allow a reasonable fact finder to conclude that:  (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex;

(3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and to create a hostile or abusive working environment; and (4) there is a basis for employer liability. *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004); accord, *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045-46 (7th Cir. 2002) (hostile work environment claim based on national origin and race).

The following incidents are relevant to Bender's hostile workplace claim. She was exposed to sexual images on company computers. She was subjected to verbal abuse that included language derogatory toward females. According to Bender, female Technicians were assigned less favorable cleaning tasks by their male co-workers whereas male Technicians generally were assigned preventive maintenance tasks. Bender Aff. ¶¶ 22, 42. Associated with the division of tasks based on sex, female Technicians generally were not trained in tasks typically assigned to men. Bender Aff. ¶¶ 96, 157-58. Bender also claims that Hill's disciplined male employees less severely than female employees for infractions of the attendance and call-in policy. Bender Aff. ¶¶ 132-36. Bender complained about differential discipline to Lisa Edington and Jackie Vanderpool (Bender Aff. ¶¶ 138-39; Pl. Ex. 10; Zaleha Dep. Ex. 19) and to Elisa Tighe (Bender Dep. II Ex. 14).

In 2000, a male co-worker called Bender at home and showed up at her home unannounced. Another male co-worker followed her around the workplace.

Also in 2000, Bender's mentor had her clean the inside of equipment which contained a moving auger.  Bender's dog was shot, and afterward her male co-workers made taunting comments about shooting dogs.  In April 2002, her mentor kissed her and grabbed her breast while they were taking a smoke break from work.  Bender also claims that her mentor retaliated against her by refusing to train her after she rejected his advances.  (This claim may properly be considered as part of the hostile workplace claim, though it also fits a more traditional type of claim in terms of sex discrimination in terms of training and promotion opportunities.)  In June 2002, an open knife like those used by male employees at Hill's was found outside the door of Bender's home.

Hill's argues that any events taking place prior to March 29, 2002, should be dismissed as time-barred because those events occurred outside the 300-day window created by the filing of the EEOC charge on January 23, 2003.  With respect to Bender's hostile workplace claim, this argument is not persuasive.  The Supreme Court held in *National Railroad Passenger Corp. v. Morgan*: "It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  536 U.S. 101, 117 (2002).  Viewing the evidence in a light reasonably favorable to Bender, she has identified acts that a reasonable jury could conclude contributed to her claim and occurred within the limitations

period – namely, the viewing of sexual images on company computers and the frequent use of language derogatory toward females by Bender's male co-workers, as well as the April 2002 incident with her mentor and his subsequent refusal to train her. As approved by *Morgan*, the court will also consider conduct prior to March 29, 2002 that was part of the same alleged hostile work environment.

      A.     *Unwelcome Harassment Based on Sex*

Of the various incidents that Bender claims contributed to a hostile work environment, the evidence could easily support a finding that sexual images on workplace computers, verbal abuse, co-workers' delegation of cleaning tasks to females and failure to train females in other tasks, differential discipline, and co-workers' unwanted attentions and touching constituted harassment based on sex. As for the remainder of the incidents alleged by plaintiff – the shooting of her dog and subsequent co-workers' comments, the finding of an open knife outside her home, and being told to clean equipment containing a moving auger – the sexual connection might appear more attenuated if the incidents were considered in isolation. However, the court may not view those incidents in isolation. See *Cerros*, 288 F.3d at 1046 (reversing summary judgment for employer in racially hostile environment case where district court had failed to consider multiple incidents in their entirety). Viewing these other acts in combination with the incidents involving the more obvious connection to sex, a reasonable jury could find that all were part of a sexually hostile environment.

-17-

B.     *"Severe or Pervasive"*

The next issue is whether the incidents that can be linked to sex were sufficiently severe or pervasive to support a claim under Title VII.   To be considered severe or pervasive, the conduct must have been objectively hostile or abusive, and the target also must have subjectively perceived it that way. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).   "[I]solated and innocuous incidents will not support a hostile environment claim."   *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996); see also *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) ("'relatively isolated' instances of misconduct that [are] not severe will not support a hostile environment claim"); but see *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) ("pervasiveness and severity 'are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute'"), quoting *Cerros*, 288 F.3d at 1047.   The court must consider the totality of the relevant circumstances.   *Harris*, 510 U.S. at 23; *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001).

A fact finder could easily conclude that Bender subjectively perceived her work environment to be hostile and abusive.   To ascertain whether Bender's work environment was *objectively* hostile or abusive, the court must consider all the circumstances, including the frequency of the discriminatory conduct; the severity

-18-

of the conduct; whether the conduct was physically threatening and/or humiliating, or merely an offensive utterance; and whether that conduct unreasonably interfered with Bender's work performance.   See *McPherson*, 379 F.3d at 438; *Wyninger*, 361 F.3d at 975-76.

Not every unpleasant workplace is a hostile environment.  Although hostile work environment claims do not require proof of tangible psychological injury, they require proof that goes beyond evidence of an uncomfortable or "merely offensive" work environment.  See *Wyninger*, 361 F.3d at 977; *Cerros*, 288 F.3d at 1046.  Still, the boundary between actionable harassment and less severe conduct is not a bright one:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures.  On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.  We spoke in *Carr* of "the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing."  It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other. . . .

*Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807-09 (7th Cir. 2000) (internal citations omitted).  The federal courts have struggled case by case.

Applying the above standard, the court finds Bender's evidence is sufficient to survive summary judgment on a hostile work environment claim.  There is at

least a genuine issue of material fact as to whether the derogatory language directed at Bender and other females was sufficiently severe or pervasive to support Bender's hostile workplace claim.  Similarly, issues of material fact exist regarding the assignment of less desirable cleaning tasks to females and the related failure to train females in other tasks.  Hill's presents no evidence that this conduct was not severe or pervasive.  Also, the court cannot find as a matter of law that Bender's exposure to sexual images on workplace computers was not severe or pervasive enough to be actionable harassment.[2]

In contrast, the unwanted attentions by co-workers in 2000 were isolated occurrences and Hill's stood ready to intervene if required.  Bender Aff. Exs. 3, 6. Similarly, the evidence indicates that the unwanted touching by Bender's mentor in 2002 was an isolated incident.  A reasonable jury could not find from the evidence that these incidents constituted severe or pervasive harassment, even in combination with other incidents.  The mentor's alleged refusal to train Bender in response to her rejection, however, could also be deemed to contribute to the discriminatory working conditions.

---

[2]In her affidavit, Bender described observing male employees watching "nude pictures of women, videos of women having sex with animals, videos of extremely large nude women, [and] videos of women masturbating."  Bender Aff. ¶¶ 89-91.  Bender's allegations in her affidavit do not contradict her deposition testimony of images such as cartoons and screen savers (Bender Dep. II at 220-28), and credibility determinations are not appropriate at the summary judgment stage.  See *Fanslow v. Chicago Manufacturing Center, Inc.*, 384 F.3d 469, 482 (7th Cir. 2004); *Morfin v. City of East Chicago*, 349 F.3d 989, 999 (7th Cir. 2003).

C.    *Employer Liability*

An employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a co-employee. Bender argues that Hill's gave decision-making power to Technicians and that male Technicians held power over female Technicians – *i.e.*, that her harassers qualify as Title VII supervisors.  An employer is subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or higher) authority over the employee.  *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998).

The evidence indicates that Technicians at Hill's were to some extent included in the processes of hiring, discharging, training, granting bonuses and raises, assigning work areas and tasks, and disciplining other Technicians. Bender Aff. ¶¶ 15, 383-88; Monroe Dep. at 54-59; Zaleha Aff. Ex. 2.  But involvement in such processes is not equivalent to holding authority to direct those processes and to make final decisions.  There is no evidence that the consensus type decision-making at Hill's and the involvement of Technicians in management decisions has erased the distinction between management and workers.  An individual is not a supervisor unless he or she possesses the authority to affect directly the terms and conditions of another worker's employment: *i.e.*, the power to hire, fire, demote, promote, transfer, or discipline an employee.  *Hall v. Bodine Electric Co.*, 276 F.3d 345, 355 (7th Cir. 2002);

*Parkins*, 163 F.3d at 1034-35.   Bender has presented no evidence that Technicians, including mentors, at Hill's had that scope of authority.   The fact that an employer authorizes one employee to oversee aspects of another employee's job performance is not sufficient to establish a Title VII supervisory relationship.   See *Parkins*, 163 F.3d at 1035 ("Although Parkins claims that [an alleged supervisor] once bragged about his ability to have employees fired, even if his boast were accurate, this does not elevate him to supervisory status."). Accordingly, the liability of Hill's for the purported harassment by Bender's fellow

Technicians, including mentors, must be determined according to the standard for co-employees.[3]

To hold Hill's liable for the actions of Bender's co-employees, Bender must show that Hill's was negligent in failing to discover the harassment or in its efforts to prevent further harassment.   See *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998); *Parkins*, 163 F.3d at 1034-35.   In hostile workplace cases, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."   *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).

Hill's argues that Bender did not put the company on notice that she believed she was being sexually harassed.   Generally, the law does not charge an employer with knowledge of harassment unless the employee makes a reasonable effort to inform the employer that a problem exists.   See *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004).   The Hill's anti-harassment policy states that sexual harassment should be reported to managers or supervisors.

---

[3]Hill's admits that area leader Everett Jenkins supervised technicians.  Def. Br. 33 at 2.   Team or area leaders may have been involved in viewing sexual images on workplace computers where the images were visible to women who reasonably found them offensive.   Also, differential discipline of male and female employees would implicate Hill's management.   Hill's could be vicariously liable for these aspects of the alleged sexual harassment.

Zaleha Dep. Ex. 1 (policy effective January 1, 2003).  If an employer has not identified a "point person" to accept complaints, or that point person is not easily accessible, "an employer can receive notice of harassment from a department head or someone that the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment."  *Parkins*, 163 F.3d at 1035, quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997).

Bender complained about verbal abuse to team leaders Scott Grybowski and Doug Dils (Bender Aff. ¶¶ 62, 109).  The evidence indicates that team leaders were Title VII supervisors.  There is at least an issue of material fact as to whether Bender reasonably believed that team leaders were authorized to receive and forward (or respond to) a complaint of harassment.  Bender also complained about verbal abuse to Dale Dangerfield of HR.  Bender Aff. ¶ 62; Pl. Ex. 2.  Moreover, Bender gave some information about harassment to Elisa Tighe at Colgate and to Cathy Zaleha at Hill's.  Bender Aff. ¶¶ 161, 213-16.[4]

_____

[4]Exactly what Bender told Tighe and Zaleha is not clear from the record, and the parties dispute what information Bender provided.  Bender claims that she complained to Cathy Zaleha on April 23 or 24 about hostile workplace harassment.  Bender Dep. II at 234-42.  This is disputed by Zaleha.  Zaleha Dep. at 57-61.  In Zaleha's notes of their conversation, there is no reference to pornography or verbal abuse other than an indirect reference to the inappropriate use of e-mail, but Zaleha's notes refer to Bender's co-workers setting her up with difficult and dirty tasks.  Zaleha Dep. Ex. 19.  Bender claims that Zaleha did not accurately record her complaint.  Bender Aff. ¶ 216.  Bender also contends that she gave notice to Tighe of a hostile work environment during Bender's phone call to the Colgate hotline.  Tighe asked Bender to send a follow-up letter regarding Bender's complaints.  The letter to Tighe dated March 26, 2002, referred to the word "harassed" once and only in reference to the auger incident.  Bender Dep. II Ex. 14; see also Pl. Ex. 42 (Colgate e-mail referring to Bender's claim of
(continued...)

One conclusion emerges from the parties' dispute over notice of sexual harassment: viewing the evidence in a light reasonably favorable to Bender, there is a genuine issue of material fact as to whether Hill's was provided with enough information regarding verbal abuse and gender-based separation of tasks and disparities in training to create a basis for believing that Bender was being sexually harassed. Furthermore, there is an issue of material fact as to whether Hill's took reasonable steps to remedy these alleged problems.

With regard to sexual images on workplace computers, in contrast, the undisputed evidence shows that Hill's knew about the problem at least by the spring of 2002, investigated the problem, suspended eleven employees in the chain of transmission of the images, and issued a memorandum warning employees about inappropriate use of workplace e-mail and computer systems. Zaleha Aff. ¶¶ 25-30; Zaleha Dep. at 99-102. There is no evidence that this remedy was not reasonably prompt or not by itself reasonably likely to stop the problem.[5]

_____

[4](...continued)
"harassment"). There is no reference to sexual images or verbal abuse of a sexual nature in Bender's letter. On summary judgment, of course, the court must accept Bender's testimony on disputed points.

[5]Bender argues that Hill's presents no evidence that the investigation constituted prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring. Hill's has refused to present documents related to any investigation of pornography based on irrelevance, attorney-client privilege, and work product doctrine. Pl. Ex. M, Interrogatory No. 26. However, Zaleha's affidavit about the investigation and subsequent discipline cited specific concrete facts and was based on personal knowledge. It is admissible without supporting
(continued...)

In sum, there is at least an issue of material fact as to whether the verbal abuse and gender-based separation of tasks and disparities in training alleged by Bender were severe or pervasive in Bender's workplace, whether Hill's had notice of these issues, and if so, whether Hill's did anything to remedy the situation. Accordingly, defendant's motion for summary judgment on Bender's hostile work environment claim is denied.

III.    *Title VII and FMLA Retaliation*

Bender claims that Hill's retaliated against her for complaining about sex discrimination in the workplace and for taking FMLA leave.  Title VII prohibits employers from punishing employees for complaining about discrimination or other practices that violate Title VII.  42 U.S.C. § 2000e-3(a); *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005).  Similarly, the FMLA prohibits employers from discriminating or retaliating against employees who exercise their rights under the Act, and from interfering with an employee's attempt to exercise those rights.  29 U.S.C. § 2615(a); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).  A reasonable trier of fact could find from the evidence that Hill's retaliated against Bender for exercising Title VII and/or FMLA rights.[6]

---

[5](...continued)
documentation and is sufficient to meet defendant's burden to establish that it took prompt and appropriate corrective action once it had notice of the problem.

[6]Bender has abandoned her claim of retaliation due to union activity.

The Seventh Circuit uses the same standard to evaluate Title VII and FMLA retaliation claims. *Buie*, 366 F.3d at 503. Bender has no direct proof of retaliatory intent, but she seeks to use the indirect method of proof. Under the indirect method, Bender must show that (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse action by her employer; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Williams v. Waste Management of Illinois*, 361 F.3d 1021, 1031 (7th Cir. 2004); *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 642 (7th Cir. 2002). If Bender could establish a prima facie case, the burden of production would shift to Hill's to articulate a legitimate, non-discriminatory reasons for its employment actions. If Hill's met its burden of production, the burden would shift back to Bender to present evidence tending to show that the reasons offered by Hill's are merely a pretext for unlawful retaliation. *Id.* If Bender produced evidence of pretext, a jury could infer retaliation.

Bender has presented evidence sufficient to establish a prima facie case of retaliation. Hill's argues that Bender's allegations do not constitute actionable adverse employment actions and thus that her prima facie case fails at the third element. In particular, Hill's argues that Bender's PIP/IIP carried no actionable consequence and that Bender was not fired or constructively discharged. An issue

of material fact exists as to whether Bender's PIP/IIP constituted an adverse employment action by decreasing her compensation.

Bender's PIP/IIP, standing alone, does not constitute a materially adverse action.  See *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).  But the PIP/IIP decreased Bender's quarterly bonus and delayed her parity raise.  Vanderpool Aff. ¶ 23; Zaleha Aff. ¶ 11.  Title VII makes it unlawful to discriminate against a person "with respect to [her] compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a).  Denial of a discretionary bonus not part of an employee's compensation package may not constitute a materially adverse action.  See *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996) (holding that denial of a discretionary bonus was not a materially adverse action); cf. *Fyfe*, 241 F.3d at 602-03 (holding that refusal to reimburse plaintiff's travel and lodging expenses not adverse employment action where plaintiff did not dispute that reimbursement was purely discretionary and trip had not been approved by superiors).  There is a question here as to whether the quarterly bonus was discretionary or was instead a part of Bender's compensation package upon which she could rely.  There is also a question regarding whether the parity raise was similar to a cost-of-living raise, in which case a delay in the raise would constitute an adverse action.  See *Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000) (the denial of a raise may constitute a materially adverse action whereas a bonus may not; while bonuses generally are sporadic, irregular, unpredictable, and

discretionary on the part of the employer, and should not be counted on by the employee, raises, especially cost-of-living raises, are the norm for workers who perform satisfactorily).[7]

Moreover, a jury could find that a reasonable employee in Bender's position would have believed by November 10, 2002 – the date she accepted a position with the federal government – that her termination was inevitable, and thus that Bender was constructively discharged by management's refusal to consent to having Carol Isaacs substitute for her on November 9th.  Constructive discharge, like actual discharge, is a materially adverse employment action.  *EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 331 (7th Cir. 2002).  There is a question as to whether Bender's reliance on area leader Jenkins' statement that if she did not work the assigned overtime on November 9th she would be fired was reasonable.  The defendant states that "no one at the facility, including Area

---

[7]Hill's argues that Bender's PIP/IIP beginning June 1, 2001 was a discrete discriminatory act occurring before March 29, 2002 – the beginning of the 300-day limitations period – and is thus time barred.  The Supreme Court in *National Railroad Passenger Corp. v. Morgan* held that any discrete acts of discrimination (not part of a hostile environment claim) that fall outside the 300-day statute of limitations period are time barred even if they relate to other discrete acts that fall within the limitations period.  536 U.S. 101, 112-13 (2002).  The Court gave specific examples of discrete acts:  termination, failure to promote, denial of transfer, and refusal to hire.  *Id.* at 114; *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 724 (7th Cir. 2004).  Bender's 2001-2002 PIP/IIP does not constitute a discrete act under the *Morgan* analysis.  Bender's PIP/IIP lasted from June 1, 2001, which was outside the limitations period, until July 26, 2002, which was within the limitations period.  The year-long disciplinary action continued into the limitations period, and thus Bender could recover for the effects of the 2001-2002 PIP/IIP if it was a discriminatory action.

-29-

Leaders such as former Area Leader Everett Jenkins, [had] unilateral authority to terminate a Technician." Zaleha Aff. ¶ 18.  But this statement implies that an employee at Hill's could not reasonably rely on any informal statements regarding her termination from anyone in management, even from Plant Manager Zaleha. A reasonable jury would not be required to reach that conclusion based on the evidence in this case.

Hill's disciplined Bender with a PIP/IIP for calling in absent four hours and twenty minutes after the start of her shift on May 30, 2001, the morning that her father went to the hospital.  Bender points to a male Technician, Jeff Hill, who was disciplined differently for a similar violation of the attendance and call-in policy. Hill failed to report to work and did not call in within the first four hours of his scheduled shift.  Hill was not disciplined with a first stage PIP as was Bender, but rather was placed in a behavioral agreement which did not affect his quarterly bonus or parity raise.  Bender Dep. II Ex. 14.

Hill's has presented non-discriminatory reasons for Bender's 2001-2002 PIP/IIP; Jeff Hill's less severe discipline; the extension of the ending date for Bender's PIP/IIP from May 30, 2002 to July 26, 2002; Bender's October 9, 2002 IIP; and Bender's separation.  According to Hill's, it placed Bender in the 2001-2002 PIP/IIP for the "no call/no show" event on May 30, 2001.  Vanderpool Aff. ¶ 15.  Edington told Bender in 2001 that Jeff Hill was placed in a behavioral agreement rather than in a first stage PIP because his incident was not considered

a no call/no show.  Pl. Ex. 10.  In 2002, Colgate admitted that the less severe treatment of Jeff Hill had been due to a misinterpretation of the attendance policy and that Hill had not been properly disciplined.  Pl. Ex. 63.  Bender's PIP/IIP was to last until May 30, 2002, but, according to Hill's, it was extended until July 26, 2002 because Bender was on leave between April 16 and May 31, 2002.  The stated reason for the October 9, 2002 performance agreement was that as of August 30, 2002, Bender's non-FMLA absences for the preceding 12 months totaled 48 hours, which was 1.5 percent above the plant norm, and that on August 29, 2002 she failed to notify Hill's of her absence before the start of her shift.  Pl. Ex. 74.  With respect to Bender's separation, Hill's states that on November 11, 2002, Operations Manager Haverkamp and HR Manager Vanderpool contacted Bender by telephone to discuss why she had not reported to work for her shift that day.  Vanderpool Aff. ¶¶ 54-55.  According to Hill's, Bender told them that she had accepted another job, and they took Bender's statement as her resignation.

    To meet her burden on pretext, Bender must present evidence from which a rational fact finder could infer that the stated reasons for her discipline and her ultimate separation from employment were not truthful, had no basis in fact, did not actually motivate defendant's decisions, or were insufficient to motivate the decisions.  *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994).  Bender

has produced evidence tending to show that defendant's stated reasons are pretextual.

Bender refers to two e-mails from Drew Stahlman at Colgate that, according to Bender, indicate that Hill's planned before November 10, 2002 to fire her. Stahlman wrote on October 10, 2002 that "we need to transition [Bender] out if at all possible.  She does not want to be there."  Pl. Ex. 74.  After Stahlman learned that Bender had accepted a new job, he wrote on November 11, 2002:  "I know that I will sleep better tonite]."  Pl. Ex. 84.  Isaacs reported that Jenkins told her in November 2002 that Bender was in too much hot water and that nothing could save Bender's job.  Isaacs Aff. ¶ 73.  These statements, in light of Bender's overall relationship with Hill's, would allow a rational fact finder to infer that Hill's was in fact planning to fire Bender before she revealed that she had accepted another job, and that the events leading up to Bender's separation were in fact motivated by reasons other than those put forth by Hill's.

In sum, Bender has presented a prima facie case and has come forth with evidence from which a reasonable fact finder could conclude that defendant's explanations for the extent of her discipline and for her ultimate separation are pretextual.  It is undisputed that Bender accepted another job on November 10, 2002.  However, a jury could still reasonably conclude from the evidence that Hill's disciplined and constructively discharged her in retaliation for her complaints of discrimination and her FMLA leave.  Accordingly, defendant's

motion for summary judgment on Bender's Title VII and FMLA retaliation claims is denied.

IV.  *Substantive FMLA Claim*

The undisputed evidence shows that Hill's did not grant Bender FMLA leave for May 30, 2001.  Bender called in about four hours and twenty minutes after the start of her shift on May 30th to say that she had been at the hospital and would be out for the day.  Bender Dep. II Ex. 3.  That morning, Bender's mother called to tell her to go to the hospital where her father had been taken after a heart attack or stroke.  If Bender's absence on May 30th should have been designated as FMLA leave and if Hill's had sufficient notice of her need for FMLA leave, then her 2001-2002 PIP/IIP and its effect on her quarterly bonus and parity raise, which were based on the May 30th incident, might have been unjustified.

The FMLA gives eligible employees the right to twelve work-weeks of unpaid leave during any twelve-month period for specified reasons.  Among those reasons is "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition."  28 U.S.C. § 2612(a)(1)(C).  Bender's absence on May 30th might have been covered by FMLA leave if Bender missed work because she went to the hospital to "care for" her father.  Under the relevant regulation interpreting the statute, the term "care for" encompasses both physical and psychological care.  See 29 C.F.R. § 825.116(a);

*Brunelle v. Cytec Plastics,Inc.*, 225 F. Supp. 2d 6, 77 (D. Me. 2002) (concluding that plaintiff satisfied FMLA's "to care for" requirement where plaintiff kept vigil at his father's hospital bedside and helped doctors make decisions concerning his father's care); *Plumley v. Southern Container, Inc.*, 2001 U.S. Dist. Lexis 16040, 2001 WL 1188469 (D. Me. Oct. 9, 2001) (concluding in dicta that plaintiff's father's testimony that his son was present with him in the hospital and that the son's presence was comforting and reassuring sufficed to meet the threshold of psychological care for FMLA purposes), *aff'd*, 303 F.3d 364 (1st Cir. 2002); cf. *Fioto v. Manhattan Woods Golf Enterprises, LLC.*, 304 F. Supp 2d 541, 544, 545 (S.D.N.Y. 2004), *aff'd*, 123 Fed. Appx. 26 (2d Cir. 2005) (denying motion for new trial on FMLA claim; plaintiff presented no evidence at trial that he went to hospital to offer comfort to mother or to assist in making medical decisions on behalf of mother, or that mother even was aware of his presence).

The burden of proof on a claim brought under the substantive rights provision of the FMLA lies with the plaintiff, who must demonstrate by a preponderance of the evidence her eligibility for and her entitlement to the benefit claimed, *i.e.*, the disputed leave.   *Cool v. BorgWarner Diversified Transmission Prods., Inc.*, 2004 U.S. Dist. Lexis 570, *12-13, 2004 WL 253252, *4-5 (S.D. Ind. Jan. 12, 2004).  Bender has failed to present evidence, or even to argue, that she provided psychological comfort to her father or assisted in medical decisions on her father's behalf on May 30, 2001.  Her deposition testimony indicates that she did not provide such care.  Bender Dep. II at 180-82.  Nor has Bender presented

evidence or argued that she gave adequate notice to Hill's of the need for FMLA leave.  Where the need for leave is not foreseeable at least 30 days in advance, which was the case here, notice must be given "as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).  Bender brushes aside defendant's arguments regarding the issues of "care" and FMLA "notice."  See Pl. Br. 58 at 27-28.  Absent at least a cogent argument that she was entitled to FMLA leave on May 30, 2001, Bender cannot defeat summary judgment on the issue.  See, *e.g.*, *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) (perfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived); *Tenner v. Zurek*, 168 F.3d 328, 330 (7th Cir. 1999) (single sentence on a point, not developed into a cognizable argument, is treated as a waiver); *Border v. City of Crystal Lake*, 75 F.3d 270, 274 (7th Cir. 1996) (perfunctory and undeveloped arguments are waived).  Accordingly, defendant's motion for summary judgment on Bender's FMLA entitlement claim is granted.

## Conclusion

Defendant Colgate-Palmolive is dismissed because it was not plaintiff's employer.  Plaintiff has set forth evidence creating an issue of material fact as to whether verbal abuse and gender-based separation of tasks and disparities in training were severe or pervasive in plaintiff's workplace, whether defendant had notice of these problems, and if so, whether defendant took reasonable steps to

remedy the situation.  Accordingly, defendants' motion for summary judgment on plaintiff's hostile work environment claim against Hill's is denied.  Defendants' motion for summary judgment also is denied on plaintiff's Title VII and FMLA retaliation claims against Hill's.  Defendants' motion for summary judgment on plaintiff's FMLA entitlement claim is granted.


     So ordered.

Date: July 26, 2005

                                  _____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Ellen E. Boshkoff
BAKER & DANIELS
eeboshko@bakerd.com

Jane Ann Dall
BAKER & DANIELS
jane.dall@bakerd.com

Rene M. Johnson
MORGAN LEWIS & BOCKIUS LLP
rjohnson@morganlewis.com

Susan W. Kline
BAKER & DANIELS
swkline@bakerd.com

George A. Stohner
MORGAN LEWIS & BOCKIUS
gstohner@morganlewis.com